

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS
## AUSTIN

GROVER SELLERS
ATTORNEY GENERAL

Honorable Roger Q. Evans, Chairman
Legislative Investigating Committee
House of Representatives
Denison, Texas

Dear Sir:

Opinion No. O-5763
Re: Enjoining the sale and the slaughter of diseased live-stock for food for human consumption.

We are in receipt of your recent letter which reads as follows:

"During the 48 session of the Texas legisla-ture the House passed Resolution No. 232 creating a committee of eight house members to investigate the sale and slaughter of diseased livestock for human consumption purposes.

"The Committee in its investigations over Texas, has found some very startling and disgrace-ful practices as well as unwholesome conditions existing that greatly impares the health of our citizenship.

"The Committee found that some individuals, companies, and corporations are so drunk or crazy to make excess profits that they lay aside all ethics of business or trade, and utterly disre-gard the health and welfare of our citizenship. We found that some buyers and slaughterers of live-stock can not see a badly infected animal with half of its head eaten away with a cancer or worms or both, or with a pus pocket as big as a peck, or other diseases that so impered the animals condi-tion that renders the meat therefrom, from being fit for human consumption. We found that these unscrupulous dealers and slaughterers have no re-spect for the Health of our people but can only

COMMUNICATION IS TO BE CONSTRUED AS A DEPARTMENTAL OPINION UNLESS APPROVED BY THE ATTORNEY GENERAL OR FIRST ASSIS

see the many dollars of profit between the price
of this class of livestock and the price of good
healthy cattle that Texas thrives so abundantly.

"The Committee in conjunction with the State
Department of Health in trying to remedy these
disgraceful conditions found our laws in respect
to the slaughtering of livestock so inadequate that
we are almost helpless in protecting the Health of
our people. With out a broader interpretation of
our laws dealing with the slaughter of diseased
livestock through Injunctions or otherwise based
on protecting the Health and Welfare of our citi-
zenship, we are almost helpless.

"Therefore, we the Committee urge and pray
that you will carefully and immediately consider
our request for a liberal ruling of some kind that
will enable the Committee to intervene in the will-
ful practice of a few to destroy the Health of our
people, which is nothing short of murder in a slow
way.

"We therefore ask a ruling on the following
questions.

"Legally: -

"Could an injunction be sustained against the
owners of a group of cattle assembled in a given
territory against the sale of said animals for
slaughter for human consumption purposes, when
positive proof could be established that the cat-
tle are badly diseased with cancer or other di-
seases or infections that renders the meat there-
from unfit for human consumption purposes.

"Legally: -

"In interest of protecting the Health of our
people, could an injunction be sustained against
the buyer or owner of badly diseased, and other-
wise unfit livestock for human consumption from

Honorable Roger Q. Evans, page 3

being transported within the State for the purpose of slaughter for human consumption purposes.

"Legally: -

"In interest of protecting the Health of our people could an Injunction be sustained against an individual, a Company, a corporation, dealing exclusively in diseased, crippled, or otherwise unfit livestock for human consumption purposes, where positive proof can be established that said individual, Company or Corporation with minor exceptions deals only in livestock that are cancerous, lumpy jawed, crippled, or badly infected with screw worms, or other diseases that cause the animals to be weakened to such an extent that they may fall down in the killing chutes.

"Legally: -

"In an effort to protect the Health of our citizenship would a charge of sabotage against an individual, a company or a corporation be within the scope of law, when positive proof was established that the individual, company or corporation was knowingly dealing in livestock unfit for human consumption purposes? Or dealing in meat or the by products that are detrimental to the Health of our people?

"The Committee further wishes to call your Department to these other facts.

"Through arrangements with certain stock yards the Committee is furnished with records as to the buyers of the above class of livestock, and we have proof that some buyers move this class of diseased livestock to pastures in large quantities, which takes them out of jurisdiction of the stock yards, and then resell them to buyers or slaughterers where in there is no inspection, or inadequate inspection which is worse than no inspection in that

Honorable Roger Q. Evans, page 4

it fools the public. Other buyers move large numbers by truck or by rail to locations that has no inspection, or inspectors that permits such class of animals to be slaughtered for human consumption purposes.

"Your attention is further called to the fact that the people dealing in this class of livestock are as clever as Al Capone was and by far a worse enemy to the public.

"As the Committee interprets the present laws dealing with slaughtering of livestock for human consumption, that insanitary conditions is about all the law covers, so it is almost impossible to stop the flow of diseased and unfit cattle into the channels of trade for human consumption purposes, without a broader interpretation of our laws.

"The Committee will be glad to furnish evidence from leading Veterinaries that hundreds of heads of such cattle are being slaughtered monthly for human consumption purposes, and that the meat therefrom is unfit for humans to eat. The Committee further has proof that much of this meat is sold in the form of ground meats, sausages, and lunch meats that is fed to school children and defense workers in preparing lunches.

"The Committee feels that lunch meats and other processed meats should be from just as healthy cattle as our prime roasts or beef steaks.

"In our appeal to you for a personal consideration of this matter we call your attention that the Legislature will not be in regular session for a year, and during that time the Health of our people is in jeopardy, and will continue to grow worse if the committee fails to find relief through the Courts, therefore we urge and pray for assistance in our efforts to safeguard the Health of our people from a few money seeking unscrupulous unworthy people that are a disgrace to be classed as citizens of any country, including Japan."

Honorable Roger Q. Evans, page 5


House Resolution No. 232, providing for the appointment of a Committee to investigate the sale of certain meat, is printed on pages 2623-25 of the May 3, 1943, issue of the House Journal. The report of the Committee is printed, on pages 3061-63 of the May 11, 1943, issue of the House Journal.

Undoubtedly the matters and facts disclosed both in your letter and in the Committee's report, justify further legislative treatment strengthening the law. Such sales should be declared a public nuisance and injunctive relief specifically authorized.

As to your last or fourth question, a careful search of our State statutes on the subject did not disclose any statute now in force applicable to the facts mentioned in your letter. It is not within the province of this Department to speculate upon the sufficiency of the present Federal statutes.

Our answer to your first three questions depend upon whether the acts mentioned therein constitutes a public nuisance to prevent which the equitable powers of a court of competent jurisdiction may be invoked to prohibit the continuance of such acts. The present statutes of Texas do not expressly authorize the issuance of an injunction to prevent the sale of dead animals or the sale and slaughter of diseased animals for human consumption. The statutes, as hereinafter shown, do denounce these acts as criminal.

The general rule is that equity does not restrain crimes; but a recognized exception to this general rule is that equity may interpose to restrain acts amounting to crimes if the facts show grounds for equitable jurisdiction, aside from the criminal feature of the Act complained of, and a need for the interposition of equity. Nuisances, 39 Am. Jur., 410, § 147; 412, § 148.

It should be borne in mind that the basic conception of a writ of injunction is that "it is a protective and preventative rather than a restorative writ, and should not be used where the law provides ample and efficient means for the prevention and punishment of crime and the preservation

of rights." San Antonio v. Schutte, (C.A. 1922) 246 S. W. 413. Again in the same case the court said:

> "Injunctions should be strictly confined to the purpose of preventing irreparable injury when the law is inadequate to attain such object. ... The writ of injunction in its beneficient use is an agency of the court filled with blessings to the people, but in its lavish and ill-considered application it becomes a terrific abuse of law and order, and a menace to republican government."

Now the power to protect the health of the public is inherent in every sovereignty -- Hanzel v. City of San Antonio, (1920 C.A.) 221 S. W. 237, error refused. Chief Justice Fisher of the Austin Court of Civil Appeals in City of Llano v. Llano County, (1893) 23 S. W. (2d) 1008, speaking of the use of an equitable remedy as a cumulative remedy, said:

> "... Whatever may have been, or is now, the construction placed upon the common law by some courts, to the effect that public nuisances that are solely injurious to the general public can only be abated at the instance of the sovereign, either by indictment or equitable remedy invoked by its law officers to that end, must yield to a policy that has grown into a principle of law in most of the states of the Union, to the effect that the state, in its sovereign capacity, has delegated its authority in this respect to those municipal corporations that are acting as city governments by authority from the state. ..."

The Legislature has passed laws regulating the slaughter of animals for food consumption and the sale thereof.

Penal Code, Article 706, provides that no "person, firm or corporation, shall within this State manufacture for sale, have in his possession with the intent to sell, offer or expose for sale or sell or exchange any article of food or drug which is adulterated or misbranded within the meaning of this chapter."

Honorable Roger Q. Evans, page 7

Penal Code, Article 707, states:

"For the purposes of this chapter an article shall be deemed to be adulterated:

"... .

"(c) In the case of food:

"... .

"(6) if it consists in whole or in part of a filthy, decomposed or putrid animal or vegetable substance, or any portion of an animal or vegetable unfit for food, whether manufactured or not, or if it is the product of a diseased animal, or one that has died otherwise than by slaughter.

"The term 'filthy' shall be deemed to apply to food not securely protected from flies, dust, dirt, and as far as may be necessary by all reasonable means, from all foreign or injurious contaminations."

The penalty for violating the pure food laws (P.C., Art. 717) is by fine of "not less than $25.00 nor more than $200.00. It shall not be necessary for the indictment to allege or for the State to prove that the act or omission was knowingly done or omitted." (Emphasis ours)

Now the court in which there has been presented an indictment or information for carrying on any trade, business or occupation injurious to public health may "on the application of anyone interested," and after hearing and proof, "restrain the defendant, in such penalty as may be deemed proper, from carrying on such trade, business or occupations, or may make such order respecting the manner and place of carrying on the same as may be deemed advisable;" and if defendant be convicted, the restraint shall be made perpetual. C.C.P., Arts. 104-109.

Penal Code, Article 695, defines a nuisance as:

"Whoever shall carry on any trade, business or occupation injurious to the health of those who reside in the vicinity, or suffer any substance which has that effect to remain on premises in his possession, shall be fined not less than ten nor more than one hundred dollars. Each day is a separate offense." (Emphasis ours)

Other articles of the statutes, for instance, Article 4664, define nuisances; but these definitions are not pertinent to the matter under discussion. See article on Nuisances in 23 Tex. Jur. 409.

The general grounds for an injunction are enumerated in Article 4642. Section 3 of that article is as follows:

"3. Where the applicant shows himself entitled thereto under the principles of equity, and the provisions of the statutes of this State relating to the granting of injunctions."

And particular cases for injunction are enumerated in Articles 4664-4668, inclusive. Article 4663 specifies that:

"The principles, practice and procedure governing courts of equity shall govern proceedings in injunctions when the same are not in conflict with the provisions of this title or other law."

Unquestionably the Legislature may provide remedies by injunction against common nuisances, and may authorize abatement of such nuisances by injunction. Walker v. State, (C.A.) 173 S. W. (2d) 731. And such injunctions are not punitive of crime but are preventive of public or private injury. Injunctions, 24 Tex. Jur., 71, § 49, n. 20.

Hamm v. Gunn, (C.A.) 113 S. W. 354, held that the right to abate nuisances is a well established doctrine of equity courts, and is based on the maxim that the owner of property must so use it as not to materially injure another. A lawful business may be conducted so as to become a nuisance, in which case the one injured thereby may enjoin the continuance of the business in such a way. Block v. Fertitta, (C.A.)

165 S. W. 504. So it has been held that an injunction will be granted in behalf of the state to abate a public nuisance which is an injury to the property or civil rights of the public at large and which it is her duty, as agent of the public, to prevent. State v. Goodnight, 70 Tex. 682, 11 S. W. 119; City of Belton v. Central Hotel, 33 S. W. 297; State v. Patterson, 37 S. W. 478.

The right to abate a nuisance does not necessarily depend on the existence of provisions of the penal code defining the act sought to be enjoined as offense and prescribing fine or imprisonment therefor. Hetrich v. State, (Civ. App.) 87 S. W. (2d) 887. But where the statute does not authorize injunction to abate a public nuisance, the State must plead and prove that the business as conducted was a nuisance in fact, otherwise she is not entitled to an injunction. All Texas Racing Ass'n. v. State, 82 S. W. (2d) 151, at page 154, aff'd., 97 S. W. (2d) 669. In this case an injunction was denied because the State went on the theory that betting on the results of dog races under pari mutuel system was a nuisance per se and prohibited by the gambling statutes. The appellate courts held that the gambling statutes did not apply and were therefore inapplicable.

And the government may abate a nuisance, whether or not the owners have been guilty of crime. Murphy v. U.S., 272 U. S. 630, 47 S. C. R. 218, 71 L. Ed. 446.

Thus it has been held that health authorities may maintain suits in equity to enjoin or restrain acts which are a menace to the health of the public, even before actual injury has been inflicted. Health, 39 C.J.S. 861, ¶ 36, notes 37, 38; Health, 29 C. J., p. 258, n. 87; Nuisances, 49 C. J. 759, n. 75; p. 802, n. 44. Nor is an injunction excluded because of the penalty provisions in a statute, supra.

In Cardwell v. Austin, (Galveston C.A. 1914), 168 S. W. 385, the court held that the Acts, 33rd Legislature, ch. 47, punishing the pollution of any water course by the discharge of any sewage therein, and providing that on conviction the county court shall issue an injunction enjoining the person or corporation responsible for the pollution from a further continuance thereof, does not deprive the district court of jurisdiction to prevent and suppress nuisances by

Honorable Roger Q. Evans, page 10

injunction. The appellant contended that "the county court alone had jurisdiction" to issue an injunction. "We think it clear," said the court, "that the Legislature in adopting the Act did not attempt or intend to interfere with the exercise by the district court of its general equity jurisdiction to prevent and suppress nuisances by means of the writ of injunction. At most the remedy by injunction conferred by the Act upon the county courts, is only cumulative of the remedy conferred by law upon and resting in the district courts. Certainly it cannot be held that the Act deprived the district courts of jurisdiction. The assignment and propositions are without merit and are overruled." The Cardwell-Austin case has been cited with approval in recent decisions by the Supreme Court.

Goldsmith and Powell, et al., v. State, (Dallas C.A. 1942) 159 S. W. (2d) 534, w. e. denied, was a suit by the State to enjoin the defendants from polluting the waters of the Neches River because salt water from the defendants' wells entered into the river, and that the defendants threatened further pollution of the public water course. The court said:

"The fact that the Legislature has provided punishment, by fine and imprisonment, for pollution of water courses ... does not affect the power of the State to seek injunctive remedy when the provisions of law are inadequate to effect the purposes intended; nor is a conviction on a criminal charge a prerequisite to the issuance of an injunction ...; nor is the district court deprived of jurisdiction to enjoin a public nuisance, where such nuisance is an injury to the property or civil rights of the public at large ... . Pollution of a public water course is a public nuisance ...; and while the pollution of water courses in this State is expressly condemned by statute, yet, being a public nuisance, the rights to abate such nuisance is lodged in the district courts, independent of any statute; and, where several persons contribute to the creation of such nuisance, they may be joined in a common action, an action in equity for injunction, against the defendants whose separate and individual acts resulted in the same

Honorable Roger Q. Evans, page 11

general consequence of wrong."   (Emphasis ours)

In Ex Parte Hughes, (1939) 133 Tex. 505, 129 S. W.
(2d) 270, our Supreme Court refused to enjoin the infractions
of our usury statutes because the nuisance though it affect-
ed the "rights of interest to some particular group, even
though that group may be of large proportions" (at page 277,
2nd column) did not affect the property or civil rights of
the public at large; in that the usury laws create only pri-
vate, not public, rights.  Mr. Justice Critz, speaking for
the court, at page 274, said:

"Our courts of equity, as such, have no jur-
isdiction to entertain suits to enjoin the com-
mission of acts merely because such acts consti-
tute crimes or penal offenses under penal laws.
This is because equity is not concerned with the
enforcement of penal or criminal statutes.  When
the State, through its proper officers, invokes
the jurisdiction of a court of equity to abate a
nuisance, it must be shown either that the action
is directly authorized by some constitutional or
statutory law, or that such nuisance is an injury
to the property or civil rights of the public at
large, -- that is, to the public generally.  ...
(citing authorities)."

In Crowder v. Graham, (C.A.) 201 S. W. 1053, 1055,
the court said:

"It is well settled that, in the absence of
some statute specifically authorizing the same,
an injunction will not lie to restrain the viola-
tion of a penal statute, simply because the act
enjoined is denounced as an offense, but that an
injunction will lie to restrain the act, even though
it is an offense, if it constitutes a public nui-
sance under the common law."

And the court must be satisfied that the anticipated injury
is iminent and certain to occur.  Nuisances, 31 Tex. Jur.,
¶ 33, page 446, n. 19.

Honorable Roger Q. Evans, page 12

The State may sue to abate a public nuisance, provided the rights of the public at large are endangered of being injured.  Thus in State v. Patterson, (1896) 14 Civ. App. 465, 37 S. W. 478, the court at page 479, said:

"... courts of equity have jurisdiction to abate public nuisances is ... well established. ... (citing authorities) But it does not necessarily follow from the facts that a common gaming house is a public nuisance, and that courts of equity have jurisdiction by injunction to abate a nuisance, that such jurisdiction will be exercised.  A court of equity may have jurisdiction of a class of cases, but may not entertain it unless the facts in the particular case wherein it is invoked require its exercise.  Before such jurisdiction will be exercised, its necessity must appear from the facts and circumstances of the particular case.  Though a court of equity has the power to interfere in all cases of nuisances, yet circumstances may exist in one case which do not exist in another to induce a court to interfere or refuse its interference by injunction.  Courts will not in all cases interfere by way of injunction to restrain the continuance of an illegal trade, the abatement of a nuisance, or the prosecution of a dangerous employment; but its powers to do so in such cases belongs to the general powers possessed by courts of equity to prevent irreparable mischief and obviate damages for which no adequate remedy exists at law.  ... (citing authorities) It is only when property or civil rights are involved, and an irreparable injury to such rights is threatened or is about to be committed, for which no adequate remedy exists at law, that courts of equity will interfere by injunction for the purpose of protecting such rights. The injury threatened to such rights may, if committed, constitute a crime, and subject its perpetrator to punishment under the criminal law; yet, as his punishment would furnish him whose property or civil rights have been irreparably injured by

the acts constituting the offense no compensation for such injury, courts of equity will interfere to prevent such an injury, notwithstanding the commission would constitute a criminal offense, not because it would be a crime, but because the injury to such rights would be irreparable. It cannot be said that such interference by a court of equity is an invasion of the domain of the criminal law, for no crime has been committed where equity interposes its arm for the protection of property or civil rights. In extending such protection, it may prevent a crime; but, as no one has a right to commit crime, no one should be heard to complain that he is restrained from its commission, when such restraint has been exercised in the jurisdiction of a court for the purpose of preventing him from irreparably injuring another in his property or civil rights. But courts of equity never interfere for the purpose of acts constituting crime because they are criminal, for they have nothing to do with crime as such. Their interposition is solely for the protection of property or civil rights; and, the only distinction between a private and a public nuisance being that the one is an injury to such rights of an individual and the other to the rights of the public at large, 'the same principle must guide the interference of the court in both cases, and that principle is this: whether the extent of the damage and injury be such as the law will not afford an adequate and sufficient remedy.' Attorney General v. Sheffield Gas Consumers' Co., 19 Eng. Law & Eq. 644. Therefore, when a state, through her proper officer, seeks the jurisdiction of a court of equity to abate a public nuisance, she must show that such nuisance is an injury to the property or civil rights of the public at large, which it is her duty, as the agent of the public, to prevent. ..." (Emphasis ours)

In Nebbia v. New York, 291 U. S. 502, 54 S. Ct. 505, 507, 78 L. Ed. 940, 89 A. L. R. 1469, Mr. Justice Roberts pertinently observed:

Honorable Roger Q. Evans, page 14

"The Constitution does not secure to any one liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people."

The late revered Chief Justice Nelson Phillips had the same thought in mind when in Spann v. City of Dallas, (1921) 111 Tex. 350, 235 S. W. 513, 515, he said:

"The police power is founded in public necessity, and only public necessity can justify its exercise. The result of its operation is naturally, in most instances, the abridgment of private rights. Private rights are never to be sacrificed to a greater extent than necessary. Therefore, the return for their sacrifice through the exercise of the police power should be the attainment of some public object of sufficient necessity and importance to justly warrant the exertion of the power.

"The public health, the public safety, and the public comfort are properly objects of this high importance; and private rights, under reasonable laws, must yield to their security.

"Since the right of the citizen to use his property as he chooses so long as he harms nobody, is an inherent and constitutional right, the police power cannot be invoked for the abridgment of a particular use of private property, unless such use reasonably endangers or threatens the public health, the public safety, the public comfort or welfare. ..." (Emphasis ours)

Cattle suffering from a dangerous, infectious, or communicable disease are public nuisances at common law. A nuisance at common law could not be legalized. People vs. Anderson, (1934) 355 Ill. 289, 189 N. E. 338, at page 342.

In Comm. v. Kennedy, (1913) 240 Pa. 214, 87 Atl. 605, 47 L. R. A. (N.S.) 673, the Pennsylvania Supreme Court

Honorable Roger Q. Evans, page 15

held the pollution of a stream the title to the bed of which is in the riparian owners to be a public nuisance, the Pennsylvania Legislature having made it a misdemeanor punishable by fine or imprisonment to pollute any of the waters in that state, the court held that injunction lies against the pollution of a stream in such a manner as to constitute a public nuisance, saying:

> "... Because sewage is the most efficient medium for the dissemination of infecting germs, which do their deadly work in such an infinite variety of insidious ways, not at all dependent upon free access of the public to the stream which the germs pollute, it cannot be said that the 'riparian owners alone have an interest in the stream.' When this deleterious substance pollutes any running stream the public health is endangered thereby. The infection from which the riparian owner himself may peradventure escape may nevertheless in a hundred ways, through his innocent acts, spread through a community; for he no more than any other lives to himself alone. ..."

Where the property rights of many citizens are involved, it is proper for the government on their behalf to invoke powers of equity, and the injunctive process may be invoked when the health or very existence of the people is menaced by the deprivation of essential food or by service of such food in a contaminated state. Also equity has the inherent power to restrain threatened nuisances dangerous to the health of the whole community, this being an exception to the principle that a court of equity has no jurisdiction in matters of crime. State v. Newark Mills Co., (New Jersey, 1935) 179 Atl. 116. In that case the court (at page 121) said:

> "This principle should not be extended beyond its sound constitutional basis. The power here exercised is inherent in courts of equity. Equitable jurisdiction has always been exercised to restrain threatened nuisances dangerous to

Honorable Roger Q. Evans, page 16

the health of the whole community; its exercise antedates our Constitution. In Hedden v. Hand, supra, Justice Kalisch, quoting from State v. Uhrig, 14 Mo. App. 413, sets forth the grounds for equitable interposition in cases of public nuisances: '"(1) To restrain purprestures of public highways or navigations. *** (2) To restrain threatened nuisances dangerous to the health of the whole community. *** (3) To restrain ultra vires acts of corporations injurious to public right;" and that the exercise of equity jurisdiction in these three classes of cases is an exception to the rule *** that a court of equity has no jurisdiction in matters of crime.' In Hutchinson v. Board of Health of City of Trenton, 39 N. J. Eq. 569, this court sustained a decree enjoining the discharge into a water course, through a pipe, of filth and offensive matter from a hotel. ...

"Moreover, the milk business ... is affected with a public interest; and it is the settled rule in this state that equity may intervene to restrain a course of conduct, in respect of a business of this character, which tends to affect the public interest injuriously. ... (citing authorities) Where the property rights of many citizens are involved, it is proper for the government upon their behalf to invoke the powers of equity. Pomeroy's Equitable Remedies, §§ 480. A fortiori, the injunctive power may be invoked when the health or very existence of the people is menaced by the deprivation of an essential food commodity, or its service in a contaminated state." (Emphasis ours)

All those who act together for the ultimate purpose of selling diseased meat to the public for human consumption may be enjoined as such a business is, in our opinion, a public nuisance.

The sale of cattle such as you describe for slaughter to be sold as food for human consumption certainly constitutes a menace to the health of the citizens. Such a business

Honorable Roger Q. Evans, page 17

is, in our opinion, a public nuisance, and, as you state, unless enjoined from being sold for human consumption would cause an epidemic of disease.

The State Board of Health and the State Health Officer have general supervision and control of all matters pertaining to the health of the citizens of this State. See Articles 4418d, 4420, 4421, 4446.

While as far as reported cases in Texas are concerned, relief of the character contemplated has not been granted or denied upon the exact facts disclosed by your letter; it does not follow by any means that the above cited precedents or authorities are not applicable or controlling. Precedents illustrate principles. They serve to demonstrate how and when they have been applied. The true precedent, however, is the correct principle applicable to the facts of a particular case. Courts should be "swift and fearless" to protect the health of the citizens.

To limit the State solely to the prosecution of those who violate the public health laws of Texas means that the State would be compelled to wait until the health menace, discomfort, ill-health and perhaps death, is actually present. To be of real value health authorities must have authority to take, and the courts should aid in taking of, such action as is necessary to prevent a health menace which is reasonably likely to occur under the facts and circumstances applicable thereto.

Trusting the foregoing fully answers your inquiries, we are

Very truly yours

ATTORNEY GENERAL OF TEXAS

By

David Wuntch
Assistant

DW:db